**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **COURTNEY BOWLUS,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:26-cv-170** |
| **THE LINCOLN NATIONAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **DEFENDANT.** | | |

# COMPLAINT

Plaintiff Courtney Bowlus ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by The Lincoln National Life Insurance Company ("Lincoln"), in connection with the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer, GAF, a Standard Industries Inc. company and North America's largest roofing and waterproofing manufacturer. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

**1.** This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA"). This suit is brought pursuant to 29 U.S.C. § 1132(a) to secure disability benefits due to Plaintiff through the group insurance policies sponsored by GAF.

**2.** The Plaintiff seeks all benefits to which she may be entitled should this Court determine she is "disabled," including long-term disability and life-coverage-during-disability benefits under policies issued or administered and underwritten by Lincoln.

**3.** Plaintiff seeks such benefits together with any other disability-related benefits the plan may provide based on the conditions documented in her medical records and opinions of her treating physicians, independent physicians, and other assessment information.

## JURISDICTION

**4.** Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq. The Plan "may be found" within this district.

**5.** Jurisdiction is further appropriate under 28 U.S.C. § 1332.

**6.** Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District and Defendant may be found or resides in this District.

**PARTIES**

**7.** Plaintiff Courtney Bowlus is a participant in the Plans at issue and thus entitled to benefits available thereunder.

**8.** Defendant Lincoln is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

**9.** Lincoln is a "fiduciary" of The Plans as that term is defined by 29 U.S.C. § 1002(21).

**10.** One of Lincoln's designated agents for service of process is:

The Prentice-Hall Corporation System, Inc.
641 South Lawrence St.
Montgomery, AL 36104

**11.** Lincoln is an entity exercising authority or control respecting the management or disposition of Plans' assets or the personnel exercising said authority over Plan assets.

**12.** Lincoln is an entity providing services to The Plans at issue.

**13.** Lincoln is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

## THE PLAN

**14.** The plan sponsor is Standard Industries Inc. This company entered into a policy agreement with Lincoln to furnish benefits for its employees inclusive of those employed by GAF.

**15.** The policy provides long-term disability coverage up to the Social Security normal retirement age, which for Ms. Bowlus is age 67.

**16.** For the first two years, disability benefits are paid if Lincoln finds that Ms. Bowlus was disabled from her own occupation.

**17.** After two years, disability benefits are paid if Lincoln finds that Ms. Bowlus was disabled from any occupation Ms. Bowlus would be reasonably fit to perform by reason of her current training, education, experience, age, physical and mental capacity.

## LINCOLN'S LIABILITY

**18.** Ms. Bowlus graduated with a BS degree from the University of Montevallo and a master's degree in industrial and organizational psychology from the Chicago School of Professional Psychology.

**19.** She also has various certifications relating to the field of human resources.

**20.** Initially Ms. Bowlus worked for a short while as a substance abuse counselor and case manager for Altapointe Health Systems in Mobile Alabama.

**21.** She then worked for Butler & Co. of Mobile, in human resources for about four years and then for a little less than a year as a sales associate for Kraft Foods in Mobile.

**22.** With Kraft Foods she moved to human resources in April 2011 and remained in that field until October 2022. This was with several employers including GAF.

**23.** She was employed by GAF when she became unable to work as of October 24, 2022.

**24.** Ms. Bowlus was initially a human resources manager for GAF beginning in May 2016 and continuing until July 2019. In July 2019, she transitioned to the People and Culture Manager, with responsibilities for providing the creation and implementation of GAF's culture, inclusion, and employee engagement strategy.

**25.** All of these occupations, except for sales associate, were considered sedentary occupations.

**26.** Ms. Bowlus had back surgery. This resulted in a failed spinal surgery followed by two additional corrective surgeries. Since then, by all reports, the surgeries may have slowed Ms. Bowlus's decline, but certainly in no way reversed

it. She experiences significant pain objectively supported by medical evidence and diagnostic testing. She is scheduled for an additional surgery for an Anterior Lumbar Interbody Fusion on August 26, 2026, in another effort to reduce pain.

**27.** Ms. Bowlus's medical records document that she suffers from neuropathic pain, lumbar radiculopathy, chronic pain syndrome, polyarthralgia, post-laminectomy syndrome, headaches, malaise, fatigue, dizziness, and status post lumbar fusions.

**28.** Given these surgeries, Ms. Bowlus has been diagnosed with post-laminectomy syndrome also more broadly referred to as "post-surgical spine syndrome". It may also be called failed back syndrome (FBSS)[1]. This is a chronic or novel type of pain that occurs after spinal surgery. It appears related to nerve root injury, compression, arachnoiditis, epidural fibrosis, adjacent-level degeneration, and spinal instability.

**29.** Due to these painful issues which were distracting from working, Ms. Bowlus finally ceased work as of October 24, 2022.

---

[1] A peer reviewed *Cureus* medical journal article titled "Prevalence of Chronic Pain After Spinal Surgery: A Systematic Review and Meta-Analysis" explores the causes and prevalence of this post-surgical spine syndrome which accounts for 5-27.6% of spine surgery. Alshammari HS, Alshammari AS, Alshammari SA, Ahamed SS. Prevalence of Chronic Pain After Spinal Surgery: A Systematic Review and Meta-Analysis. *Cureus*. 2023 Jul 13;15(7):e41841. doi: 10.7759/cureus.41841. PMID: 37575867; PMCID: PMC10423077.

**30.** Ms. Bowlus filed for short-term disability benefits and Lincoln found that she met the definition of disability and paid her claim until long-term disability benefits commenced as of April 22, 2023.

**31.** Lincoln found Ms. Bowlus disabled from performing her own occupation which was a sedentary occupation.

**32.** Ms. Bowlus has reported problems with fatigue and malaise associated with her back pain issues. She has been diagnosed with chronic pain syndrome and requires narcotic pain medicine to help control her pain symptoms.

**33.** The pain was chronically plaguing Ms. Bowlus on a daily basis. Ms. Bowlus's condition has been such that all of her providers agree that she is incapable of any full-time work.

**34.** Going back to 2023, Dr. Donohoe has assessed Ms. Bowlus as having a below-sedentary capacity because of, among other things, his opinion that she could not be reasonably expected to maintain a seated posture more than "occasionally" over the course of any given day. He was also quite clear that in his professional opinion Ms. Bowlus was (and remains) incapable of exerting even minimal forces so as to perform any work lifting 1-10 lbs.

**35.** Lincoln received the same opinion of Ms. Bowlus's lack of functionality from her physical therapist who found, based on her work with Ms.

Bowlus, that she should only sit occasionally or for one-third or less of the workday and to never lift 6-10 lbs.

**36.** Lincoln relies in part on the Dictionary of Occupational Titles as does the Social Security Administration for evaluating the physical demands of occupations. A sedentary occupation is one which requires sitting for most if not all of the workday and lifting up to 10 pounds at least one-third of the workday.

**37.** Lincoln found the evidence persuasive then paid Ms. Bowlus's claim as to her own occupation. However, Lincoln sought to terminate the claim when the definition of disability changed to the inability to perform any occupation notwithstanding that it had already accepted that Ms. Bowlus was not capable of performing her sedentary occupation.

**38.** Lincoln selected Dr. Theodore Kopp to perform an independent medical examination on or about August 4, 2025. Dr. Kopp is frequently selected by an insurer and most recently in another case filed in this court known as Marlo Martin v. Principal Life Insurance Company, 1:25-cv-00029-KD-N.

**39.** Dr. Kopp alleges he videotaped Ms. Bowlus and then contended that she had no change in her gait walking from the car driven by her husband (Ms. Bowlus is too impaired to drive) and into Dr. Kopp's office. Dr. Kopp relied on the video for his comments but then refused to provide that to Lincoln and Lincoln

refused to make the effort to obtain that. The video is part of the claim record, but its production was refused when requested by letter of March 18, 2026.

**40.** Dr. Kopp did this before, making subjective comments from a video which he then refused to provide as part of the claim record as documented in Martin v. Principal 1:25-cv-00029-KD-N Doc 1 Complaint, PageID.9 paras. 35 - 36; and Doc. 18 Brief in Support of Motion for Summary Judgment, PageID.111-113, 123-128.

**41.** Dr. Kopp took x-rays but then omitted them from his report. Lincoln omitted the x-rays also from the claim record and refused to produce them upon demand by letter dated March 18, 2026.

**42.** Dr. Kopp never requested that Ms. Bowlus lift any object. He claims he observed her lift her purse but he did not weigh her purse and in fact it was 1 or 2 pounds at the most. Dr. Kopp also made these same types of unsupported comments involving a purse in the exam that led to litigation in Martin v. Principal, 1:25-cv-00029-KD-N.

**43.** Dr. Kopp did not perform the majority of the exam, but rather his assistants asked many questions and took notes. Those notes were also requested as they are part of the claim record but Lincoln refused to obtain them and furnish them. See also Martin v. Principal, 1: 25-cv-00029-KD-N as noted in para. 40 above.

**44.** Dr. Kopp's exam was described by Ms. Bowlus as generic and superficial. Treating physician exams were much more thorough.

**45.** Dr. Kopp opined that Ms. Bowlus had no restrictions with sitting throughout a workweek and could occasionally walk and carry up to 20 pounds. Now, in conflict with three years of prior findings, Dr. Kopp said Ms. Bowlus could work a full-time sedentary occupation.

**46.** Lincoln denied the claim by letter dated August 22, 2025. It pasted in much of Dr. Kopp's report. Lincoln offered no explanation demonstrating how three years of prior decision-making were no longer valid nor how Ms. Bowlus, whose condition never improved significantly, was now fit to return to work. In essence, Lincoln now found that Ms. Bowlus could return to her own occupation which was a sedentary occupation.

**47.** In order to demonstrate that Lincoln's decision was wrong Ms. Bowlus attended a functional capacity evaluation (FCE) on January 9, 2026. That evaluation was conducted by an occupational therapist who for well over twenty-five years has performed these examinations for insurers, employers, and individuals.

**48.** The FCE required the testing of Ms. Bowlus's ability to sit, stand, walk and lift weights with actual measurements of disability rather than subjective estimations. The FCE documented that Ms. Bowlus could only sit up to a

maximum of four hours per day. It further documented that she could stand or walk and that she could lift/carry up to 10 pounds occasionally.

**49.** The FCE further documented that Ms. Bowlus's gait slowed the longer she was tested walking. Her walking speed was only 2 to 2.2 mph when normal walking speed is 3 mph.

**50.** Dr. Kopp never performed any evaluation with actual lifting or testing on walking or standing.

**51.** Ms. Bowlus then was examined by an independent physician, at the request of her attorney Clay Williams, on January 29, 2026. This examination was performed by Dr. Robert L. Ross, an occupational physician who works for USA Health. He has performed independent exams for employers, insurers, individuals and attorneys for more than 41 years.

**52.** Dr. Ross, after a review of the claim record and all medical records, including the recent FCE, opined that Ms. Bowlus did not have the ability to sustain effort for normal full time work in any capacity including a sedentary capacity. He further found that her cognitive abilities which he specifically tested, where severely diminished such that she could not maintain the proper focus, pay attention, and concentration to function reliably in the workplace. He further found that the FCE was consistent with her medical records and the presentation he observed during the exam.

**53.** Lincoln however doubled down and now hired Dr. Kevin Kohan from California to review medical records and assess whether Ms. Bowlus was disabled by her pain and other limitations from performing full-time work.

**54.** It was curious as to why Dr. Kohan was selected. He was a graduate of the Arizona College of Osteopathic Medicine which did not exist until 1995. He graduated within the first ten years of the school's existence. The school is still not ranked in the 2025 rankings by US News and World Report as to the best medical schools in the United States. He is a clinical assistant professor but that is for a dental school. He has no credentials from any board governing medical examiners or medical reviews. There are no significant peer reviewed articles he has published, nor has there been any indication that he conducted a peer review of any medical article relevant to failed back surgery or pain.

**55.** Dr. Kohan rejected the FCE that had been conducted because he falsely contended that there were no sufficient validity measures to assess whether the claimant gave maximum effort. Thus, he disagreed that Ms. Bowlus was limited to four hours of sitting each day. He also falsely contended that Ms. Bowlus could lift and carry more than 10 pounds, as the FCE limitation was inconsistent with the surgical history and over all medical evidence.

**56.** The occupational therapist however furnished the report in response documenting that in addition to his extensive experience and training in performing

such evaluations over the course of thirty-four years, the FCE in question does follow industry standards using accepted validity criteria as documented in peer reviewed FCE literature inclusive of "Best Practices 2018". He notes the hypocrisy of this given that Dr. Kohan relied on Dr. Kopp's report regarding his subjective interpretation of the video snippet that was withheld from the claim record and picking up her purse without a known weight. A purse to lift is not a functional capacity test.

**57.** Further the response report documented that Ms. Bowlus's efforts at walking produced an antalgic gait the longer she attempted to walk. Thus, there was no inconsistency as argued by Dr. Kopp who stated she walked from the car without a limp but then when observed had an antalgic gait.

**58.** Dr. Kohan extensively relied on Dr. Kopp's IME, yet he ignored the lack of validity measures and entirely subjective comments of Dr. Kopp. Dr. Kohan ignored the IME performed by Dr. Ross and claimed he could ignore the claimant's self-reported symptoms of pain and incorrectly contended there were no significant neurological deficits (L5-S1 canal stenosis, neuroforaminal narrowing, positive left leg test, nerve studies consistent with radiculopathy).

**59.** Dr. Kohan discounted any subjective reports of pain or her sedation issues with memory attention or concentration without referencing any standard

allowing him to opine on such matters based merely on a review of medical records.

**60.** Dr. Kohan contended that Ms. Bowlus could sit eight hours a day and up to one hour at a time and thus contended she was capable of full-time employment. He based this, in part, contending that the latest MRI of May 28, 2025 does not support significant nerve root compression or any structural impingement.

**61.** Lincoln furnished Dr. Kohan's report before it denied the appeal and a response was permitted. The response was sent on March 13 and 19, 2026. In particular, it was noted that Dr. Kohan's assertions were demonstrably wrong and further that he falsely contended the MRI of May 28, 2025, did not demonstrate significant nerve root compression or structural impingement. This opinion ignores the reality that scarring from a laminectomy does objectively support pain findings. There are numerous peer review medical articles on this issue. He cites no authority or literature for his opinion based soley on his subjective opinion.

**62.** Further Dr. Kohan is not in a position to render an opinion on pain and functional loss. Rendering an opinion on this requires a clinical examination. See, SSA Regulatory Requirement set out at 20 CFR §404.1529. Since Lincoln required application for Social Security benefits it should have found such a standard instructive.

**63.** The Department of Veteran's Affairs also requires a clinical exam to evaluate pain and functional loss when supported by pathology. 38 C.F.R. §4.40.

**64.** AMA Guides for the Evaluation of Impairment provides direction to physicians to evaluate pain and functional loss in the context of a clinical examination.

**65.** Dr. Kohan cites to no standard and by implication asserts that despite his lack of credentials he is better qualified than all treating physicians, an independent examining physician at a major university, and an FCE to evaluate pain and functional loss.

**66.** Dr. Kohan, without noting any specific record also states, "the majority of examinations do not document abnormalities in speech, attention, concentration, memory, cognition, psychometer activity, or interpersonal reaction". Yet he fails to note a single record, let alone cite to what he says constitutes the "majority of records" which would document this. Dr. Kohan's report is repeatedly reliant on subjective assertions without any specific evidence backing up his assertion.

**67.** Lincoln responded yet again with another report from Dr. Kohan, creating an endless review process. Dr. Kohan again asserted there was no disc bulge, canal stenosis, or neural foraminal narrowing, but in fact there was, on a

May 28, 2025, MRI. Dr. Kohan's lack of fairness and influence of bias was demonstrated over and over again.

**68.** A further submission was provided by Ms. Bowlus rebutting and discrediting Dr. Kohan's report, but Lincoln ignored the unrebutted evidence and denied the appeal nonetheless on April 2, 2026, with the evidence submitted simply ignored.

**69.** ERISA requires the plan administrator, "[i]n accordance with regulations of the Secretary," to provide a "full and fair review ... of the decision denying the claim." 29 U.S.C. § 1133. The central purpose of protecting a claimant's right to the opportunity of having a "full and fair review" is to permit a claimant to obtain sufficient information to prepare either for further administrative review or for review of the claim by a federal court. The accompanying regulations explain "this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries." 29 C.F.R. § 2560.503-1(a).

**70.** In this case, Lincoln's selectivity on the evidence it credits over the evidence it does not, smacks of "cherry-picking" by a claims team operating under a financial conflict of interest where more attention is given to corporate profits than to accurate and fair decision making. It is an abuse of discretion for Lincoln

to pick and choose evidence to support its decision while ignoring other evidence that does not support it.

**71.** "To afford a plan participant whose claim has been denied a reasonable opportunity for full and fair review, the plan's fiduciary must consider any and all pertinent information reasonably available to him." *Grossmuller v. Int'l Union, United Automobile Aerospace and Agricultural Implement Workers of Am.*, 715 F.2d 853, 857 (6th Cir. 1983); *see also* 29 C.F.R. § 2560.503-1(h)(2)(iv). Lincoln has done that here by crediting facially questionable reviews by its own physician reviewers over Ms. Bowlus's medical providers who are best positioned during treatment to assess what she can and cannot do and what she experiences.

**72.** By ignoring evidence clearly contradicting its own findings and engaging in these other procedural abuses, Lincoln has not performed a fair and reasonably considered review in its termination and closure of this claim. This requires this termination of benefits to be overturned.

**73.** When there are "numerous instances in which defendant mischaracterized evidence" that is abuse of discretion. Where the medical evidence is not reasonably read by an insurer, a denial of benefits cannot be supported.

**74.** Federal law requires that an employer's grant of discretionary authority in connection with the establishment of an ERISA-governed plan must

be *explicit*. None of the Plan documents which we have or which were provided by Lincoln include *any* grant of discretionary authority flowing from the Plan or Plan Sponsor to any Lincoln entity. Rather, it appears Lincoln has simply taken it upon itself to run the Plan and designate *itself* which, of course, it is powerless to do.

**75.** The claim process has been exhausted and further exhaustion is futile.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Courtney Bowlus respectfully requests this Court find jurisdiction and venue appropriate, and after trial, grant the following relief:

A. For reversal of the decision terminating benefits and payment of all benefits on that date and going forward;

B. For interest on all past due benefits at 1.5% per month or such interest rate as the Court find equitable;

C. For attorney and paralegal fees, costs and case expenses;

D. For such equitable relief as the Court finds appropriate;

E. For declaratory relief inclusive of a directive that Defendant perform a full and fair review on future benefit decisions;

F. For such other relief as may be proper in the Court's view.

Respectfully submitted,

David P. Martin
ASB-3500-M68D

**The Martin Law Group, LLC**
**Attorney for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402
Phone (205) 343-1771
Facsimile (205) 343-1781
david@erisacase.com

**Plaintiff's Address:**
Courtney Bowlus
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendant's Address:**
The Lincoln National Life Insurance Company
c/o The Prentice-Hall Corporation System, Inc.
641 South Lawrence St.
Montgomery, AL 36104

## REQUEST FOR SERVICE BY CERTIFIED MAIL

The Plaintiff requests service of this Complaint on the Defendant by Certified Mail pursuant to Federal Rules of Civil Procedure 4(e)(1).

David P. Martin
ASB-3500-M68D